Andrea L. Calvaruso
Taraneh J. Marciano
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York 10178
(212) 808-7800
(212) 808-7897 (Facsimile)

*Attorneys for Plaintiff*
*S.A.R.L. Divertis Properties Group*

JUDGE NATHAN

**ECF CASE**

**14 CV 6577**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

S.A.R.L. DIVERTIS PROPERTIES GROUP

Plaintiff,

vs.

DENMAY, INC. D/B/A BLUE ORANGE GAMES

Defendant.

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff S.A.R.L. Divertis Properties Group ("Plaintiff" or "DPG"), by its

undersigned counsel, as and for its Complaint against Defendant Denmay, Inc. d/b/a Blue

Orange Games ("Defendant" or "Blue Orange"), alleges as follows.

## NATURE OF THE ACTION

1.      DPG brings this action against Blue Orange for a permanent injunction,

declaratory judgment, and damages for trademark infringement, copyright infringement, trade

dress infringement, and unfair competition, all caused by, *inter alia*, Blue Orange's continued

promotion, distribution and sale of Plaintiff's SPOT IT! games in the United States after

termination of its license agreement which permitted such use, and in blatant disregard of a

judgment of the Tribunal de Grande Instance de Paris.

## THE PARTIES

2. Plaintiff is a French company in the business of creation, publication and distribution of games and other products around the world, including in the United States, with its principal place of business 86 rue Pixérécourt, 75020 Paris, France. Plaintiff is the parent company of the French company Divertis, which is the majority shareholder of the French company Play Factory.

3. Upon information and belief, Defendant is a California corporation that promotes, distributes and sells a variety of games and puzzles in the United States, with its principal place of business at 1000 Illinois Street, San Francisco, California, 94107.

4. Upon further information and belief, Blue Orange is the subsidiary of Blue Orange Edition ("Blue Orange France"), a corporation organized under the laws of France, with its principal place of business located at Le Haut Fresnay, 14480 Saint Gabriel Brecy, France. Upon further information and belief, Blue Orange France holds majority ownership of Blue Orange, which was founded in 2000 by its two principals and owners, Julien Mayot and Thierry Denoual. Thierry Denoual is the owner of Blue Orange France. Upon information and belief, Thierry Denoual and Julien Mayot are the dominant and controlling force of the activities of Blue Orange complained of herein, and Blue Orange France and Blue Orange are under common management and control.

## JURISDICTION, VENUE AND GOVERNING LAW

5. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, and 28 U.S.C. § 1338(a) and (b), as it involves substantial claims arising under federal law. This Court also has diversity jurisdiction over the parties and this action under 28 U.S.C. §

1332 because one party is domiciled and resides in California and one party is domiciled and resides in France and the amount in controversy exceeds $75,000.

6.     This Court has jurisdiction over Blue Orange because Blue Orange transacts business within the State of New York and in this district. For example, Blue Orange's products, including those at issue in this action, are sold at many stores in the County of New York and to consumers in New York County via Internet sales.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c) in that Blue Orange conducts business in this district and Blue Orange is subject to personal jurisdiction in this district.

## THE FACTS

### The Game

8.     In France in or about 2008-2009, DPG's subsidiary and predecessor in interest, Play Factory, created and developed a game based upon an idea by a French citizen named Mr. Denis Blanchot. In January 2009, Mr. Blanchot licensed Play Factory the right to use his idea and any intellectual property rights associated therewith, worldwide in all languages for as long as the duration of the intellectual property, if any, in connection with broad categories of use including the creation, promotion, distribution, and sale of the game and variant editions of the game ("Blanchot License"). The Blanchot License specifically notes that Play Factory's contribution to the game includes the game rules, and the format, presentation, packaging and cover of the game.

9.     In March 2010, the parties executed an amendment to the Blanchot License assigning all of Play Factory's rights and obligations thereunder to Play Factory's parent company, Divertis. Divertis' rights and obligations in and to the Blanchot License were

thereafter transferred to DPG on July 1, 2010. The Blanchot License is currently valid and subsisting.

10.     Since 2009, DPG has produced, marketed and sold a card game it developed based upon Mr. Blanchot's idea, consisting of 55 round cards packaged in a brightly colored round metal tin bearing the name of the game in cartoonish bubble lettering. On each card is a unique combination of eight brightly colored pictures in various shapes and sizes placed on different parts of the cards. The rules for the game are illustrated and include text, images of the cards and examples of the symbols contained on the cards. The cards, directions and packaging for the game feature a cartoon image of an open hand with the thumb turned down, with a single eyeball and mouth on the palm, and with two legs:

 (hereafter referred to as the "Hand Logo").

11.     The object of the game is for players to find the one matching image between the cards within a time limit. Each image has only one match throughout the card deck. In addition to the basic matching game, players may use the cards to play five mini games, namely: "The Tower," "The Well," "Hot Potato," "The Poisoned Gift," and "Triplet." The card game described above is referred to herein as the "Game."

12.     Plaintiff and its predecessors in interest have produced, marketed, and sold the Game in France since as early as September 2009 under the trademark DOBBLE. Since 2011, the Game has been sold under license by Plaintiff in 25 countries around the world and has gained enormous popularity. The Game has been a best-seller, amounting to approximately $91 million in sales worldwide since 2009, including over $41 million in sales in the U.S. alone since 2010. The Game has won numerous awards, including a nomination for T.O.T.Y. Toy of the

Year in 2010, the Parents' Choice Foundation Gold Award in 2010, ASTRA (American Specialty Toy Retailing Association) Best Toy for Kids in 2010, Dr Toy's 10 Best Games 2010 and Best Vacation Children's Products 2010, Oppenheim Toy Portfolio's Best Toy Award Gold Seal 2010, and many others.

13.     In or about 2011, Plaintiff developed an electronic version of the Game for mobile applications that has been and is being sold at the Apple App Store in the U.S. and worldwide under the trademark DOBBLE: SPOT IT!

14.     Plaintiff owns copyrights in the copyrightable portions of the Game, including the text and artwork of the illustrated Game rules, the appearance of the Game cards, the Hand Logo artwork and the Game packaging artwork.  Plaintiff also owns the rights in and to the trademark DOBBLE, which it has used since as early as 2009 to promote and sell the Game. Plaintiff also owns all rights in and to the trademark SPOT IT!, which it has used for years to promote and sell the Game in the U.S., both directly and via its licensee, Blue Orange.

15.     Pursuant to the BO License (hereafter defined), DPG's subsidiary and predecessor in interest, Play Factory, and Blue Orange France are record co-owners of U.S. Trademark Registration No. 3,847,543 for the trademark SPOT IT!.  However, as confirmed by the French Judgment (hereafter defined), the BO License provided that such co-ownership ceased with the termination of the agreement, at which time all trademark rights reverted to Plaintiff.

16.     Plaintiff also owns valid and protectable trade dress in the Game, which consists of: (1) 55 round cards, each featuring a unique combination of eight brightly colored pictures in various shapes and sizes placed on different parts of the card; (2) packaged in a brightly colored round metal tin bearing the name of the game in cartoonish bubble lettering; and

(3) illustrated game rules for the game including text, images of the cards and examples of the symbols contained on the cards (the "Game Trade Dress").

**The License Agreement**

17.    In January 2010, while promoting its Game at a trade show in France, Plaintiff was approached by Mr. Thierry Denoual, co-founder and owner of Defendant Blue Orange, and CEO and principal of Defendant's parent company, Blue Orange France. Mr. Denoual sought a license from Plaintiff to market and sell the Game in the United States and English-speaking territories in Canada. The parties thereafter began negotiating the terms of a license agreement. During the negotiations, Mr. Denoual represented to Plaintiff that the trademark DOBBLE would not be effective in marketing and selling the Game in the U.S. Therefore, pursuant to the license, Plaintiff agreed to allow Blue Orange France to use the name SPOT IT! in connection with the promotion and sale of the Game and to file a trademark registration in the U.S. Patent and Trademark Office for the mark SPOT IT!, provided the trademark registration was jointly owned by Plaintiff.

18.    On February 3, 2010, DPG[1] and Blue Orange France entered into a license and distribution agreement (the "BO License") pursuant to which DPG, among other things, licensed Blue Orange France the right to develop, distribute and sell an English-language version of the Game and various market-specific derivative versions thereof, in the United States and English-speaking provinces in Canada. The BO License specifically states that "the license will be exploited directly by the American subsidiary of the Licensee, based in San Francisco, California" (as translated from the original French). Mr. Denoual executed the BO License on

---

[1] After Play Factory assigned all of its rights relating to the Game to DPG in 2010, Blue Orange France paid all royalties under the BO License to DPG. On June 19, 2012 a rider to the BO License was executed which acknowledged the assignment of the rights and obligations under the agreement from Play Factory to Plaintiff.

behalf of Blue Orange France.  Pursuant to the BO License, Blue Orange France was to account

to DPG and pay royalties to DPG three times per year for all sales of the Game and all versions

of the Game sold by Defendant.

19.     The original version of the Game sold by Defendant in the U.S. and

Canada under the trademark SPOT IT! was nearly identical to the Game sold elsewhere in the

world under the name DOBBLE, but for the exact translation of the text of the Game rules and

packaging from French to English, and the color of the product packaging:

 

Examples of the DOBBLE Game and SPOT IT! Game are attached as Exhibit A.  Plaintiff

supplied Blue Orange France with the text and images of the illustrated rules, the illustrated

cards and the illustrated packaging of the Game, which Blue Orange France copied and used to

create the SPOT IT! version of the Game and derivative games, pursuant to the BO License.

20.     The Game and the majority of derivative games distributed and sold by

Defendant until about 2013 in the U.S. include rights notice language acknowledging that SPOT

IT! is a trademark of Blue Orange and Play Factory, France; the Game was published and

distributed by Blue Orange USA, San Francisco, California, USA under a DPG license; and the DOBBLE Game was created by Play Factory.

21.     As noted above, the SPOT IT! Game was an instant success in the U.S. Given the success of the Game in the U.S., and pursuant to the BO License, Blue Orange developed certain market-specific derivative versions of the Game each consisting of 55 round cards featuring a unique combination of eight brightly colored pictures in various shapes and sizes placed on different parts of the cards packaged in a round metal tin (collectively, "Derivative Games"). The Derivative Games are all marketed and sold under the SPOT IT! trademark, such as SPOT IT! Party, SPOT IT! Jr!, SPOT IT! MLB, and SPOT IT! NHL. The majority of Derivative Games also feature the Game Trade Dress. The SPOT IT!, SPOT IT! Party and some of the Derivative Games feature the Hand Logo. Examples of the product specifications and rules for only some of the Derivative Games, which include images of the cards and packaging are attached hereto as Exhibit B.

22.     From February 2010 until March 2013, Blue Orange France provided royalty statements and paid royalties to DPG in connection with Defendant's sale of the SPOT IT! Game and all Derivative Games sold in the U.S. and Canada pursuant to the BO License. During this time, Blue Orange communicated and consulted with Plaintiff regarding the creation, promotion and sale of the Game and Derivative Games under the SPOT IT! trademark and the Game Trade Dress, and Plaintiff exercised quality control with respect to the licensed products sold by Defendant in the U.S. pursuant to the BO License.

**Blue Orange Violates the Agreement**

23.     In or around April 2013, DPG discovered that in December 2011, without DPG's authorization or knowledge, Blue Orange filed three separate applications with the U.S. Copyright Office, claiming Blue Orange France was the exclusive owner of copyrights in and to:

NY01\IngrA\2931017.8          8

(1) the illustrated rules for the SPOT IT! Game; (2) SPOT IT! Game cards; and (3) packaging of the SPOT IT! Game, including claims that the works were each first created and published in 2009 in France as a work for hire. Information regarding the resulting U.S. Copyright Registrations from the U.S. Copyright Office online database and copies of the deposit copies associated with each registration are attached hereto as Exhibit C ("U.S. Game Registrations").

24.     In or around August 2013, Blue Orange France ceased sending the royalty statements and payments to DPG in connection with Defendant's sale of the Game and the Derivative Games. Plaintiff thereafter learned that Defendant was selling the licensed games outside of the licensed territory, in violation of the BO License. DPG sent multiple letters throughout the summer of 2013 to Blue Orange and its parent Blue Orange France, demanding that Defendant and Blue Orange France comply with the BO License, and transfer ownership of the U.S. Game Registrations for the SPOT IT! version of the Game to DPG. Blue Orange and Blue Orange France refused to comply.

25.     Plaintiff recently discovered that Defendant has begun unilaterally removing notices regarding DPG and Play Factory's intellectual property rights in the Game from the packaging of the licensed Game and Derivative Games, and has been negotiating sublicensed versions of the Game to third party property owners without notice or permission from Plaintiff. For example, upon information and belief, Defendant entered into a license agreement with the Disney company to create Derivative Games including images from Disney properties such as DOC MCSTUFFINS and PLANES, without permission from Plaintiff.

26.     On October 7, 2013, DPG filed an action against Blue Orange France in the Tribunal de Grande Instance de Paris seeking a judgment that (i) the Game is protected under French law; (ii) the BO license was valid and enforceable; (iii) Blue Orange France breached the

BO License, resulting in termination of the agreement; (iv) Blue Orange France's rights to exploit the Game and Derivative Games, and its ownership or right to use the SPOT IT! trademark terminated upon termination of the BO License; (v) Blue Orange France must account for and pay to DPG all past due royalties due under the BO License; and (vi) the U.S. Game Registrations must be amended to reflect the actual ownership and authorship of the Game in the name of DPG and its affiliate Play Factory, respectively.

27.     Blue Orange France argued primarily that the BO License was invalid because DPG did not own valid intellectual property rights in the Game licensed thereunder.

**The French Judgment Terminating the BO License**

28.     Under the French judicial system, the parties to a lawsuit are entitled to due process of law consisting, among other things, of the right: (i) to prior notice of court proceedings concerning their rights or claims against them; (ii) to have their case heard by an impartial court; (iii) to have the opportunity to defend against all claims against them; and (iv) to appeal orders and judgments rendered against them.

29.     A civil lawsuit in France is initiated by the service of a complaint upon the defendant and the registration of the evidence of such service with the court of competent jurisdiction.

30.     Under the French Code of Civil Procedure, a party may, in certain circumstances, request an accelerated procedure by asking for an audience with the President of the court in which the lawsuit is filed. When requesting such accelerated procedure, a plaintiff must submit his entire case to the court and the defendant. If the procedure is granted, the plaintiff will only be allowed to introduce new exhibits to rebut the defendant's claims.

31.     On October 4, 2013, the President of Tribunal de Grand Instance de Paris heard DPG's request for an accelerated procedure.  The President found sufficient ground to grant the request on the basis of the non-payment of royalties, the copyright registrations made without DPG's knowledge, and the risk Blue Orange France would declare bankruptcy to avoid having to pay such royalties.

32.     In France, the Tribunal de Grande Instance is, among other things, competent to judge civil matters in excess of €10,000.  The choice of the Tribunal de Grande Instance in Paris in this case was proper since it was designated by the parties in the BO License as the court of competent jurisdiction.

33.     On order of the President of the Tribunal de Grande Instance, a hearing was held on November 26, 2013.  At this hearing, Blue Orange France argued that the matter should be heard in a different Chamber of the Tribunal de Grande Instance de Paris than the one initially assigned because according to Blue Orange France, it had more expertise to deal with copyright and trademark issues.  Blue Orange France's motion was granted and the matter transferred to the Third Chamber.  The parties were thereafter given additional time to present their arguments.

34.     Prior to the new hearing scheduled for March 18, 2014, the parties' attorneys exchanged six sets of briefs.  On October 23, 2013, Blue Orange France's counsel submitted 54 exhibits with their brief; on November 19, 2013, 48 new exhibits; on November 25, 2013, and January 8, 2014, 10 new exhibits on each date; on January 14, 2014, 4 new exhibits; and on March 11, 2014, 14 new exhibits.  With respect to the exhibits, there is no pre-trial discovery in France.  Each party decides and presents the evidence which is most advantageous to its case.

35.     On March 18, 2014, the parties presented their oral arguments to the court.

The case was heard by a panel of three independent judges which did not include the President of

the Tribunal de Grande Instance.

36.     On June 19, 2014, this panel issued a decision that is over twenty pages

long, making detailed findings of fact and law (the "French Judgment"). A certified English

translation of the French Judgment is attached as Exhibit D. The French Judgment was made

pursuant to the panel's examination of the voluminous evidence and arguments submitted by the

parties pursuant to French law.

37.     The French Judgment held, among other things, that:

a.     French copyright law governs the rights in and to the Game because it was created in
France and DPG owns valid copyrights in the Game under French copyright law;

b.     The BO License was valid and was breached by, *inter alia*, Blue Orange France failing to
pay royalties to DPG in connection with Defendant's sale of the Game and the Derivative
Games since September 2013;

c.     The BO License was breached by Blue Orange France when it filed U.S. Copyright
Registrations for the copyrighted works associated with the Game in the name of Blue
Orange France and attempted to deprive DPG of its rightful ownership in the Game;

d.     Blue Orange France cannot claim ownership of the copyrightable elements of the SPOT
IT! Game, which was created in France pursuant to French copyright law, and Blue
Orange France must contact the U.S. Copyright Office to request an amendment of the
U.S. Game Registrations to reflect the actual ownership and authorship of the Game in
the name of DPG and its affiliate Play Factory, respectively;

e.     The BO License is terminated as of June 19, 2014, and all rights granted to Blue Orange
France under the agreement immediately reverted to DPG. Therefore, Blue Orange
France must cease all exploitation of the Game and the Derivative Games as well as the
SPOT IT! trademark;

f.     Blue Orange France must pay DPG  €500,000 as an account on royalties owed to DPG
pursuant to the BO License (the actual amount of the royalties to be determined by an
expert designated by the court); and

g.     Blue Orange must pay damages to Plaintiff in the amount of €50,000 and pay DPG's
legal fees in the amount of €20,000.

38. Under the French Code of Civil Procedure, the immediate enforcement of a judgment by a civil court is not automatic unless exceptions to the rule apply. Here, the judges agreed that the circumstances of the case required immediate enforcement and ordered the same. Judges usually grant immediate enforcement of a judgment when there is bad faith on the part of the non-prevailing party, when the violation of the prevailing party's rights is blatant and when chances that the non-prevailing party will win on appeal are low.

39. Blue Orange France complied with the French Judgment only with respect to the payment of the account on royalties and that of the damages and legal fees, and transferred €570,000 to DPG's bank account on June 27, 2014. However, Blue Orange France has not complied with the injunctive portion of the French Judgment because it continues to promote, distribute and sell the Game and the Derivative Games in the U.S. via its subsidiary, Defendant Blue Orange.

40. On July 21, 2014, Blue Orange France filed a notice of its intention to appeal the French Judgment. Pursuant to French law, a party is obligated to comply with a decision which has been ordered enforced pending any appeal of the decision as a whole. Therefore, Blue Orange France is under continued obligation to comply with the French Judgment.

41. On August 1, 2014, Blue Orange France applied to the Cour d'appel de Paris seeking to stay the enforcement of the French Judgment pending its appeal. DPG opposed Blue Orange France's request. The Cour d'appel rejected the request in its entirety on August 14, 2014, on the grounds that Blue Orange France did not produce any material evidence supporting any of its claims. Therefore, Blue Orange France and Defendant must comply with the injunction contained in the French Judgment.

**Blue Orange's Promotion, Distribution and Sale of SPOT IT! Game and
Derivative Games Violates the French Judgment and DPG's Rights**

42.     On June 20, 2014, counsel for DPG sent a cease and desist letter to Julien

Mayot, Chief Executive Officer of Blue Orange, seeking Blue Orange's compliance with the

French Judgment.  The letter demanded that Blue Orange:

> (i) Cease and desist from any further promotion, distribution or
> sale of the Game in any version, including but not limited to
> removal of all images of and references to the Game on internet
> websites, social media pages, catalogs or other promotional and
> sales vehicles; and
>
> (ii) Cause all unsold units of the Game in any version to be
> recalled from any retailers or distributors to whom they may have
> been supplied and returned to [DPG] for disposal at [DPG's]
> discretion; and
>
> (iii) Provide [DPG] with a sworn affidavit affirming that [Blue
> Orange] ha[s] fully complied with the foregoing demands, stating
> the number of units of the Game, in any version, remaining in
> inventory as of the date [of the cease and desist letter] (including
> the recalled units).

43.     Blue Orange's U.S. attorney responded to the cease and desist letter on

July 17, 2014, refusing to comply and questioning whether the French Judgment was enforceable

against Blue Orange in the United States.  Blue Orange is presently promoting, distributing and

selling the Game and Derivative Games in the United States in violation of both the French

Judgment and DPG's intellectual property rights.  Blue Orange has acknowledged that it

continues to sell the Game and Derivative Games in the U.S. after the French Judgment was

issued.  It also has acknowledged that it currently owns no rights in the Game.  Indeed, on July

18, 2014, Defendant's French attorney sent an email to an agent for Play Factory seeking to

purchase Play Factory's rights in the Game in the U.S.

44.     Upon information and belief, since the time it first requested a license from Plaintiff, Defendant has deliberately engaged in a pattern of behavior intended to wrongfully usurp Plaintiff's valuable copyrights and trademark rights associated with the Game.

45.     If Blue Orange is permitted to continue to promote and sell the Game and Derivative Games in the United States in clear violation the French Judgment, DPG will suffer irreparable harm that will be difficult to quantify.  DPG is presently negotiating a potential distribution agreement for exploitation of its copyrighted Game in the U.S. by a new licensee that has significant resources and distribution channels.  Such an opportunity may be lost if Blue Orange is allowed to continue to promote and sell DPG's Game and Derivative Games in the U.S. itself.

46.     Moreover, Blue Orange's continued use of the SPOT IT! trademark and the Game Trade Dress in connection with products in the U.S. prevents DPG from being able to control the quality of products sold in connection with its trademarks and trade dress, and threatens DPG's goodwill in the marks.  The potential loss of reputation and goodwill that DPG will suffer should Blue Orange be allowed to continue its unauthorized use of the DPG trademarks and trade dress, is immeasurable.

## COUNT I
## DECLARATORY JUDGMENT

47.     DPG repeats and re-alleges the allegations contained in paragraphs 1 through 46 as if fully set forth herein.

48.     The French Judgment held, among other things, that:

a.      French copyright law governs the rights in and to the Game because it was created in France and DPG owns valid copyrights in the Game under French copyright law;

b.      The BO License was valid and was breached by, *inter alia*, Blue Orange France failing to pay royalties to DPG in connection with Defendant's sale of the Game and the Derivative Games since September 2013;

c.    The BO License was breached by Blue Orange France when it filed U.S. Copyright
      Registrations for the copyrighted works associated with the Game in the name of Blue
      Orange France and attempted to deprive DPG of its rightful ownership in the Game;

d.    Blue Orange France cannot claim ownership of the copyrightable elements of the SPOT
      IT! Game, which was created in France pursuant to French copyright law, and Blue
      Orange France must contact the U.S. Copyright Office to request an amendment of the
      U.S. Game Registrations to reflect the actual ownership and authorship of the Game in
      the name of DPG and its affiliate Play Factory, respectively;

e.    The BO License is terminated as of June 19, 2014, and all rights granted to Blue Orange
      France under the agreement immediately reverted to DPG.  Therefore, Blue Orange
      France must cease all exploitation of the Game and the Derivative Games as well as the
      SPOT IT! trademark;

f.    Blue Orange France must pay DPG  €500,000 as an account on royalties owed to DPG
      pursuant to the BO License (the actual amount of the royalties to be determined by an
      expert designated by the court); and

g.    Blue Orange must pay damages to Plaintiff in the amount of €50,000 and pay DPG's
      legal fees in the amount of €20,000.

      49.    The French Judgment was rendered after a full and fair trial before the

Tribunal de Grande Instance de Paris, a civil court with jurisdiction over amounts in controversy

exceeding  €10,000, which competently conducted the trial in this case upon its regular

proceedings.

      50.    Blue Orange France was duly served and appeared before the court via

competent counsel, and defended itself according to fair principles.  Indeed, the parties engaged

in multiple exchanges, over five months, of argument and evidence, and ultimately presented

oral argument to a three-judge panel.

      51.    The French Judgment, over twenty pages long, was issued upon the

Tribunal's impartial view of the facts presented to it and the controlling French law.

      52.    The French Copyright law applied by the French court affords

substantially similar protections to copyright owners as the U.S. Copyright Act and does not

conflict with any U.S. or New York State public policy.

53.     The French contract law applied by the French court, which substantially parallels New York law concerning contract formation and breach, likewise does not contravene U.S. or New York State public policy.

54.     Defendant is the U.S. subsidiary of Blue Orange France and Defendant's co-founder and owner, Mr. Denoual, executed the BO License on behalf of Blue Orange France. Blue Orange France and Defendant share common ownership and control.  Mr. Denoual is a dominant and controlling force of the activities of Defendant and Blue Orange France, including the activities complained of herein.

55.     Both Blue Orange France and Defendant derived their prior rights to promote, sell, and/or distribute the Game exclusively from the BO License.  Thus, Blue Orange's interests in the outcome of the French proceeding were entirely aligned with those of its parent, Blue Orange France.  The BO License specifically provides that the license will be performed by the American subsidiary of Blue Orange France, based in San Francisco, California.

56.     The French Judgment is valid and enforceable under the doctrine of comity against Blue Orange France, and Blue Orange as its U.S. subsidiary with whom it is in privity.

57.     Blue Orange's acts in the U.S. constitute a violation of the French Judgment.

58.     Based on the foregoing allegations, there exists between the parties a controversy of sufficient immediacy and reality to warrant declaratory relief.

59.     Pursuant to 28 U.S.C. § 2201, DPG is entitled to the issuance of a declaratory judgment declaring that the French Judgment is valid and enforceable, and recognizing and confirming the French Judgment as a judgment of this Court.

## COUNT II
## REGISTERED TRADEMARK INFRINGEMENT (15 U.S.C. 1114)

60.    DPG repeats and re-alleges the allegations contained in paragraphs 1 through 59 as if fully set forth herein.

61.    DPG is the current owner in all rights in the SPOT IT! trademark which it has used to promote and sell games in U.S. interstate commerce since as early as 2010 via its licensees Blue Orange and Blue Orange France.  DPG has also used the SPOT IT! mark in connection with its promotion and sale of an electronic version of its Game in U.S. interstate commerce since as early as 2011.

62.    Defendant's use of the SPOT IT! mark in connection with the sale of games in U.S. interstate commerce from February 3, 2010 until June 19, 2014 was pursuant to the BO License from Plaintiff, and its use inured to the benefit of Plaintiff.

63.    The French Judgment provides that, pursuant to the BO License, any ownership Blue Orange France had in the SPOT IT! trademark terminated upon termination of the BO License.  Therefore, all rights in the mark and the U.S. Trademark Registration No. 3,847,543 reverted to DPG's sole ownership on June 19, 2014.

64.    Defendant's continued unauthorized use of the licensed SPOT IT! mark after termination of the BO License on June 19, 2014 constitutes trademark infringement as a matter of law.

65.    Blue Orange's unauthorized use of the trademark SPOT IT! on or in connection with the promotion and sale of Blue Orange's products is intended to cause, has caused and is likely to continue to cause confusion, mistake and deception among the general consuming public as to whether they originate from, or are affiliated with, sponsored by, or endorsed by DPG.

66.     Blue Orange has acted with knowledge of DPG's ownership of the trademark SPOT IT! with the deliberate intention to unfairly benefit from the incalculable goodwill symbolized thereby.

67.     Blue Orange's acts constitute trademark infringement in violation of Section 32 of the Lanham Act (15 U.S.C. § 1114).

68.     Upon information and belief, by its unauthorized acts, Blue Orange has made and will make substantial profits and gains to which it is not in law or equity entitled.

69.     Upon information and belief, Blue Orange intends to continue its infringing acts, and will continue to willfully infringe the trademark SPOT IT!, unless restrained by this Court.

70.     Blue Orange's acts have damaged and will continue to damage DPG, and DPG has no adequate remedy at law.

## COUNT III
## UNFAIR COMPETITION AND
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

71.     DPG repeats and re-alleges the allegations contained in paragraphs 1 through 70 as if fully set forth herein.

72.     DPG is the current owner in all rights in and to the SPOT IT! trademark which it has used to promote and sell games in U.S. interstate commerce since as early as 2010 via its licensees Blue Orange and Blue Orange France. DPG has also used the mark in connection with the promotion and sale of an electronic version of its Game in U.S. interstate commerce since as early as 2011.

73.    Defendant's use of the SPOT IT! mark in connection with the sale of games in U.S. interstate commerce from February 3, 2010 until June 19, 2014 was pursuant to the BO License from Plaintiff, and its use inured to the benefit of Plaintiff.

74.    The French Judgment provides that, pursuant to the BO License, any ownership Blue Orange France had in the SPOT IT! trademark terminated upon termination of the BO License on June 19, 2014. Therefore Plaintiff is the sole owner of all rights in the SPOT IT! trademark.

75.    Blue Orange's unauthorized use of the trademark SPOT IT! on or in connection with the promotion and sale of Blue Orange's products after termination of the BO License is intended, and is likely to confuse, mislead, or deceive consumers and the public as to the origin, source, sponsorship, or affiliation of the products, and is intended, and is likely to cause such parties to believe in error that the products have been authorized, sponsored, approved, endorsed or licensed by DPG, or that Blue Orange is in some way affiliated with DPG.

76.    Blue Orange's acts constitute a false designation of origin, all in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

77.    Upon information and belief, by its unauthorized acts, Blue Orange has made and will make substantial profits and gains to which it is not in law or in equity entitled.

78.    Upon information and belief, Blue Orange intends to continue its willfully infringing acts unless restrained by this Court.

79.    Blue Orange's acts have damaged and will continue to damage DPG, and DPG has no adequate remedy at law.

## COUNT IV
## TRADE DRESS INFRINGEMENT (15 U.S.C. § 1125(a))

80.     DPG repeats and re-alleges the allegations contained in paragraphs 1 through 79 as if fully set forth herein.

81.     DPG owns valid and protectable trade dress in the Game Trade Dress, which consists of: (1) 55 round cards, each featuring a unique combination of eight brightly colored pictures in various shapes and sizes placed on different parts of the card; (2) packaged in a brightly colored round metal tin bearing the name of the game in cartoonish bubble lettering; and (3) illustrated game rules for the game including text, images of the cards and examples of the symbols contained on the cards.

82.     DPG's Game Trade Dress is inherently distinctive and has acquired secondary meaning in the marketplace as a matter of law.

83.     DPG has made substantially exclusive use of the Game Trade Dress in U.S. interstate commerce since as early as 2010 in connection with the promotion and sale of games, via its licensee, Blue Orange.

84.     DPG and its licensees have expended substantial sums in promoting games bearing the Game Trade Dress, including the Game, for sale in the U.S. As a result, the games bearing the Game Trade Dress have gained enormous popularity. Indeed, the Game has been a best-seller, amounting to approximately $91 million in sales in 25 countries since 2009, including over $41 million in sales in the U.S. alone since 2010.

85.     The Game bearing the Game Trade Dress has won numerous awards including being nominated for T.O.T.Y. Toy of the Year in 2010, the Parents' Choice Foundation Gold Award in 2010, ASTRA (American Specialty Toy Retailing Association) Best

Toy for Kids in 2010, Dr Toy's 10 Best Games 2010 and Best Vacation Children's Products 2010, Oppenheim Toy Portfolio's Best Toy Award Gold Seal 2010, and many others.

      86.    Defendant's use of the Game Trade Dress in connection with the promotion and sale of games, including the Game and Derivative Games, in U.S. interstate commerce from February 3, 2010 until June 19, 2014 was pursuant to the BO License from Plaintiff and its use inured to the benefit of Plaintiff.

      87.    The French Judgment provides that, pursuant to the BO License, any rights Blue Orange France had to exploit the Game and Derivative Games bearing the Game Trade Dress terminated upon termination of the BO License. Defendant's continued use of the Game Trade Dress after termination of the BO License on June 19, 2014 constitutes trade dress infringement as a matter of law.

      88.    Blue Orange, without authorization from DPG, has continued to design, manufacture, advertise, promote, sell and/or offer for sale, and/or is causing to be designed, manufactured, advertised, promoted, distributed, sold and/or offered for sale products which contain a collection of design elements that bear the Game Trade Dress or are confusingly similar to the Game Trade Dress.

      89.    Blue Orange's acts are calculated to deceive, or are likely to deceive, consumers who recognize and associate the Game Trade Dress with one source. Moreover, this conduct is likely to cause confusion, to cause mistake or to deceive consumers as to the source of Blue Orange's products, or as to a possible affiliation, connection or association between DPG and Blue Orange's products.

      90.    Blue Orange thereby has willingly infringed DPG's rights in the Game Trade Dress.

91.     Upon information and belief, by its acts, Blue Orange has made and will make substantial profits and gains to which it is not entitled in law or in equity.

92.     Upon information and belief, Blue Orange intends to continue its willfully infringing acts unless restrained by this Court.

93.     Blue Orange's acts have damaged and will continue to damage DPG, and DPG has no adequate remedy at law.

**COUNT V**
**COMMON LAW UNFAIR COMPETITION**

94.     DPG repeats and re-alleges the allegations contained in paragraphs 1 through 93 as if fully set forth herein.

95.     Defendant's bad faith conduct complained of herein constitutes unfair competition in violation of the common law of the State of New York.

96.     Upon information and belief, by its acts, Blue Orange has made and will make substantial profits and gains to which it is not entitled in law or in equity.

97.     Upon information and belief, Blue Orange intends to continue its willfully infringing acts unless restrained by this Court.

98.     Blue Orange's acts have damaged and will continue to damage DPG by, among other things, infringing DPG's trademark SPOT IT! and Game Trade Dress, and preventing DPG from continuing to sell its Game and related licensed products in the U.S. market via an authorized licensee.

99.     DPG has no adequate remedy at law.

**COUNT VI**
**COPYRIGHT INFRINGEMENT**

100.    DPG repeats and re-alleges the allegations contained in paragraphs 1 through 99 as if fully set forth herein.

101.    Plaintiff owns valid copyrights in and to certain copyrightable elements of the Game, which was first created and published in the country of France in 2009.

102.    Plaintiff's Game and copyrightable portions thereof are the subject of U.S. Copyright Registration Nos. VA 1-795-994, VA 1-797-079, and TX 7-454-256.

103.    As determined by the French Judgment, DPG owns copyrights in the copyrightable portions of the Game, including the text and artwork of the illustrated Game rules, the appearance of the Game cards, the Hand Logo artwork and the Game packaging artwork. The French Judgment further holds that the Derivative Games created by Defendant are derivative versions of the Game created pursuant to the BO License.

104.    As also determined by the French Judgment, the BO License, pursuant to which Blue Orange France and its U.S. subsidiary Blue Orange were licensed to create, promote and sell the SPOT IT! Game and Derivative Games, was terminated on June 19, 2014. Therefore, Defendant's continued use, display, production, distribution or sale of the Game and any copyrightable elements thereof, or any works substantially similar thereto, after June 19, 2014 constitutes willful copyright infringement.

105.    Blue Orange, with full knowledge of DPG's rights, willfully infringed DPG's copyrighted material by displaying, reproducing and distributing exact copies of the Hand Logo and copyrightable portions of the Game, and by using, displaying, producing and distributing works that are substantially similar to, and/or are copied and derived from the copyrightable elements of the Game without authorization from DPG and in violation of DPG's rights under the U.S. Copyright Act.

106.    Upon information and belief, Blue Orange engaged in such activity intentionally and despite notice of DPG's copyrights for the specific purpose of infringing DPG's copyrights, and deriving unlawful benefits therefrom.

107.    DPG has been damaged by Blue Oranges's acts complained of herein in an amount not yet known, but believed to be in excess of $500,000, including statutory damages of at least $30,000 and as much as $150,000 with respect to each separate work which has been willfully infringed.

108.    DPG is entitled to recover from Defendant the gains, profits and advantages Defendant has obtained as a result of its acts of copyright infringement in an amount not yet known but to be determined at trial.

109.    Upon information and belief, Blue Orange intends to continue its willfully infringing acts unless restrained by this Court.

110.    Blue Orange's acts have damaged and will continue to damage DPG, and DPG has no adequate remedy at law.

## COUNT VII
## FRAUD ON THE U.S. COPYRIGHT OFFICE

111.    Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 110 as if fully set forth herein.

112.    As set forth above, Blue Orange caused the filing of applications for U.S. Copyright Registrations in and to copyrightable elements of Plaintiff's Game (VA 1-795-994, VA 1-797-079, and TX 7-454-256) based upon the false statement of material fact that Defendant's parent company, Blue Orange France, was the author and exclusive owner of copyrights in and to the copyrightable elements of the English version of the Game, including:

(1) the artwork and text of the illustrated rules; (2) the appearance of the game cards; and (3) the appearance of the packaging (the "U.S. Game Registrations").

113.    Such false representations regarding authorship and ownership were material to the registrability of the copyrights.

114.    Blue Orange had knowledge of the falsity of the representations, which were made with intent to deceive the U.S. Copyright Office, with the objective that the U.S. Copyright Office would issue registrations deeming Blue Orange France the exclusive author and owner of such copyrighted works.

115.    The U.S. Copyright Office relied upon Blue Orange's false representations in issuing the U.S. Game Registrations that deem Blue Orange France author and owner of the copyrightable elements of the Game.

116.    Plaintiff has been and will continue to be irreparably harmed unless the U.S. Game Registrations are amended to reflect DPG as the sole and true owner of the copyrighted works and its subsidiary, Play Factory, as the sole and true author thereof.  Plaintiff has no adequate remedy at law.  Therefore, Plaintiff is entitled to an order from this Court directing the U.S. Copyright Office to correct the U.S. Game Registrations, assigning all rights therein to DPG, or alternatively, directing Blue Orange to file such assignments with the U.S. Copyright Office.

**WHEREFORE,** Plaintiff DPG demands judgment against Defendant BLUE ORANGE as follows:

1.    That the French Judgment is valid and enforceable, and recognizing and confirming the French Judgment as a judgment of this Court.

2.      That Defendant, its owners, officers, agents, employees and attorneys, and all those persons or entities in active concert or participation with it or any of them, be permanently enjoined from:

 (i) manufacturing, importing, advertising, marketing, promoting, supplying, distributing, offering for sale or selling any products which bear the trademark SPOT IT!, the Game Trade Dress, or any other mark confusingly similar thereto, or engaging in any other activity constituting an infringement of any of DPG's rights in the trademark SPOT IT!, its Game Trade Dress, or any other trademark owned by DPG; and

 (ii) engaging in any other activity constituting unfair competition with DPG, or acts and practices that deceive the public and/or the trade, including, without limitation, the use of design elements and designations associated with DPG; and

 (iii) copying, displaying, or distributing Plaintiff's copyrighted works, or the copyrightable elements of the Game, including the text and artwork of the illustrated Game rules, the appearance of the Game cards, the Hand Logo artwork and the Game packaging artwork, and all images incorporating elements substantially similar to any copyrightable portion of the Game; and

 (iv) promoting, advertising, or selling goods or materials which include a copy of any of the copyrightable portions of the Game, or any images incorporating elements substantially similar to the copyrightable portions of the Game.

3.      That Defendant account to Plaintiff for all gains, profits and advantages derived from Defendant's wrongful acts.

4.     That Plaintiff recover from Defendant all of Defendant's profits and all damages, including lost profits, sustained by Plaintiff as a result of Defendant's wrongful acts, and such other compensatory damages as the Court determines to be fair and appropriate.

5.     That Plaintiff be awarded all the costs, disbursements and attorneys' fees incurred by Plaintiff in bringing this action.

6.     That Defendant be ordered to deliver up to Plaintiff for destruction or other disposition all remaining inventory of all products bearing Plaintiff's trademark SPOT IT! or Game Trade Dress, including all advertising, promotional and marketing materials therefor, as well as all means of making same.

7.     That Defendant, its owners, officers, agents, employees and attorneys, and all those persons or entities in active concert or participation with it or any of them, be ordered to deliver under oath, to be impounded and destroyed, all originals, copies, facsimiles, and duplicates of all goods and materials bearing infringements of the copyrightable portions of the Game.

8.     At Plaintiff's election, that Defendant pay to Plaintiff statutory damages in a minimum amount of $30,000 and up to $150,000 per copyrighted work infringed, pursuant to 17 U.S.C. §505.

9.     That the U.S. Game Registrations were obtained through fraud, and directing the U.S. Copyright Office to assign all rights in and to the U.S. Game Registrations to Plaintiff and correct the authorship and ownership information.

10.    That Plaintiff be awarded pre-judgment interest on any monetary award made part of the judgment against Defendant.

11.    That Plaintiff be awarded such additional and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED:  August 15, 2014           KELLEY DRYE & WARREN LLP
        New York, New York

By: _____
    Andrea L. Calvaruso
    Taraneh J. Marciano
    101 Park Avenue
    New York, New York 10178
    (212) 808-7800

*Attorneys for Plaintiff*
*S.A.R.L. Divertis Properties Group*